## H. K. REGAR & SONS, Inc., v. SCOTT & WILLIAMS, Inc.

District Court, S. D. New York.
Feb. 19, 1932.

John M. Cole, of New York City (Joshua R. H. Potts and T. Bertram Humphries, both of Philadelphia, Pa., of counsel), for plaintiff.

Howson & Howson, of New York City (Hubert Howson and Hubert A. Howson, both of New York City, of counsel), for defendant.

CAFFEY, District Judge.

Due to my own ineptitude in mechanical matters and to the weakness of my comprehension of trade terms or words familiar to counsel and witnesses, and yet unfamiliar to me, in the branch of business involved in this case, I have feared throughout that I was misunderstanding, and to some extent I cannot yet rid myself of the fear that I may still lack understanding of, the precise meaning of the testimony as given in which trade words and trade expressions were used.

It is a comfort to realize that, if I make a mistake, there is a remedy on appeal. I can only do my best and I assure counsel that reversal on appeal has no terrors for me. As I conceive of the appellate court, it is for me a comfort rather than an institution of which I stand in awe, because it may differ from the conclusions which I reach.

There are three questions for determination. These are whether there was anticipation of what is comprehended within the patent in suit; whether there was invention; and, if so, whether there was infringement.

None of the questions can be fairly passed on without a background. It is in the light only of an accurate appreciation of the patent in suit that the issues can really be considered at all. In advance, therefore, of taking up the questions, I must apply myself to stating as nearly as may be what is in the patent.

From my study of it, as I see it, there are five general features and two special features. Each of the features, the general as well as the special, must be taken into account. The special features in a sense are of greater consequence than are the general features. Nevertheless, both must be borne steadily in mind.

The general features are these: We are concerned with a process. That process relates to the production of seamless fabrics. The purpose of the process is ornamentation. The application of the process is only to the part of the fabric which is known in the trade as the cuff. The particular part of the cuff that is affected is its turn or the line at its turn. The object sought to be attained by the ornamentation at that point is production of a scalloped or picoted edge. That is true as to fabrics generally under the first claim and as to stockings, especially, under the second claim. As counsel have agreed, and as seems to me obvious, the two claims must stand or fall together.

I repeat that it is, in the view of the background of the general features, that we must approach the problem upon which an adjudication is asked.

The two particular features, which lie, as I see it, right on the face of the letters patent, are (1) tucked portions and (2) folding. We cannot escape from—there appears from mere analysis of the language employed in the document itself, without resort to anything outside the document—the conclusion that those are the two essentials of what is claimed in the letters patent themselves to be embraced in the patent.

Now, let us see if this be not true. Let us see, on examination of the paper itself, if this be not true.

Look at the claims. What are the words employed? In both claims they are "tucks" and "folding."

Turn, then, to the statement in the specifications of what constitutes the invention claimed. The invention claimed in the specific and the only specific object described in

the specifications is, to quote the words employed, "to provide knitted fabrics with open tucked portions which, when folded along a transverse line of the open portions, will produce a scalloped or picoted edge." In the clause just quoted, there are used the two phrases "open tucked portions" and "the open portions"; but it is manifest that, when the words "the open portions" are used, the reference is only to the previous words "open tucked portions."

When we take up the succeeding clause in the specifications, which undertakes to describe the method, there is set out what the method consists of. The word employed, it is to be noted, is "consists," and that is a word that is limiting in its significance. In this clause it is said that "the method of producing the scalloped or picoted edges of knitted fabrics consists in forming tucks in suitable spaced wales along a transverse line of the fabric, and folding the fabric along the said line."

There again, equally with the framework of the preceding clause, the characteristic words are "tucks" and "folding," precisely as when we read the two claims. In all, the two essential words are "tucks" and "folding."

It seems to me, therefore, plain upon the face of the words themselves, that the two features of what is claimed as an invention involve the elements of tucks and folding, unless there be elsewhere in the letters patent something which requires a departure from that which has already, in the portion of the letters patent to which I have referred, been indicated to be the two essential features.

Are there elsewhere in the patent any words or phrases which are in conflict with or which require modification of the two notions which are inherent in the employment in the parts that I have mentioned of the words "tucks" and "folding"?

Outside of the claims, outside of the two statements in the specifications of the invention and of the method to which I have already referred, there are employed in the specifications the words "long stitches" and "open work." Are those out of harmony? I think not. As mere matter of language, there is no inconsistency between either of these other phrases and the phrases "open tucked portions," "forming tucks," and "tucks." It is a mere illustration with which all of us are familiar in describing things; from time to time, we shift from one set of words to another. It is an illustration also of what we frequently encounter in our own language—the English language does not lend itself to precision of expression to the same extent as do some other languages, notably the French.

There is another clause in the letters patent which seems to me to confirm the notion that there is no inconsistency between the phrases which employ the words "tucks" and "tucked portions," and which is certainly confirmatory in nature. That is the clause dealing with "tension" and "wrinkling." It is there said that: "The severe tension on the yarn forming the longest stitch tends to wrinkle the fabric alongside the centers of the formations of open work so that, when the cuff turned over as shown in Figure 4, scallops 22 are produced."

You will observe that in this clause there are used the words "longest stitch" and the words "open work." And yet by mere application of the mind itself, without the aid of any expert explanation, as well as by mere observation of the drawings, it is easily comprehensible that what has been previously described as the "tucked portions," what has elsewhere been called "the tucks," inescapably means somewhere within that portion illustrated in figure 3 by the number 21. Not alone so, but it must be within the tucked portions.

Moreover, without resort elsewhere than to the drawings, as illustrative of the language employed, it seems to me that it is inescapable that what is referred to as the "open work" and what is referred to as "the long stitch" or "the longest stitch" must unavoidably be within that portion which has been created, as described, by the process of tucking.

What I have said thus far is mere analysis of language; of the words employed in the letters patent themselves. It is a familiar proposition of law that, where the language of a document is capable of interpretation on its face, resort should not be had to the outside in order to determine its meaning. This is a principle of universal application, so far as I know, in the law governing construction of writings. An example is ascertainment of the meaning of a statute. Resort may not be had to the history that lies back of the enactment of the statute, such as to the reports made upon the bill which resulted in the statute or to the changes that occurred during the progress of the bill toward enactment. It is only in the event, when the statute comes before the court in final form, that the court, from examination

of the words employed, is left in doubt as to its meaning, or there is what is called in the law an ambiguity, that we may go outside of the four corners of the instrument.

So here, there being—so far at least as I can see—no difficulty from an analysis of the letters patent themselves in determining what it means, there is no warrant for going to the file wrapper to determine its meaning.

So much for the background—a thing which we need, and which cannot be dispensed with, in answering the questions which constitute the issues in this case.

There is something further, however; and that also is of the essence. In the specifications there is a description of the production of the tucks. This production is there said to consist of three steps or of three exceptions to the ordinary procedure in this class of manufacture by machines of the kind with which we are here concerned. Those three steps are (1) selection of the number of long needles, (2) setting the cams so as to form the ordinary body of the fabric, (3) and this is the most important of them all, the lowering of the cams behind the long latch needles, so as to produce the tucks.

Let us see, by examination of the clause describing production, if that be not true. It is illustrative only, and yet it goes to the heart of the ascertainment of what was in the mind of the patentee and in the mind of the government in making the grant.

It is said: "In producing a stocking such as shown in the drawing, the knitting machine is set up and the stocking knitted in the usual manner with the exception * * *"; then we come to the three steps which I have referred to. What are the exceptions? The language is, "with the exception that as many long latch needles are spaced around the cylinder as scallops or formations of open work are desired." In other words, there must be equality in number of the long latch needles with the number of the formations which are to result from the tucking, with the formations of the scallops desired. It is in that way, as I conceive it, from the language employed, that there may be variations in the number of scallops, it being necessary at all times to keep equal the number of the tucking operations with the number of scalloped shapes that the operator is to bring about as a consequence of the operation.

The language then proceeds to the second step: "The cams are set so that the long and short latch needles cooperate to produce ordinary knitting in the body of the fabric." In

other words, what is going to be done is merely a part of an operation of the seamless machine. The usual knitting in the body of the fabric is not to be interfered with while the doing of the thing for which invention is claimed is in progress. The usual knitting and the doing of the special thing are to take place concurrently.

That brings us to the third step. It is in the statement of the third step that the description is given, as I conceive it, of what is claimed to be an invention. The clause is introduced by the word "but." The word "but" is followed by a clause which limits the succeeding words to the operation dealing with the two steps of tucking and folding. It is said: "But, when it is desired to produce the stitch which forms the open work and scallops, the cams behind the long latch needles are lowered during two or more reciprocations so that the loop in the hook cannot ride over the latch and consequently is not pulled through the loops on the needles."

In that part of the language, there is something that one could not fully conceive of without some understanding of what is familiar in the art. Yet under the proof it involves nothing except what is familiar in the art. On the other hand, there is nothing in the language the meaning of which is difficult of ascertainment as matter of statement of the steps taken toward the accomplishment of the end in view.

So I say, in view of the language employed, it appears to me perfectly obvious that the first essential feature of the invention as claimed is the tucking.

So far as concerns the second feature of it, I cannot escape agreement with counsel for the plaintiff that "line" as employed means the line which is established by the tucks themselves. I say that because, by referring to the statement in the specifications, we cannot avoid that conclusion, and it is familiar that the specifications and the claims must be read together in order to get an accurate comprehension of what was the intention of the government in making the grant.

Upon the phase of the matter concerning the line, let us turn back again to the statement of the invention. It is: "To provide knitted fabrics with open tucked portions which," and here come the essential words, "when folded along a transverse line of the open portions." The use of the words that I have just quoted, "when folded along a transverse line of the open portions," it seems to me, incontrovertibly demonstrates that the

line in which we are interested is that which is established by a folding along, something that is connected with, the tucks. As I have already said, the "open portions" mean the same thing as the "open tucked portions."

When, therefore, it is said that the folding shall be along a "line of the open tucked portions," and when it is further said that it shall be along "a transverse line of the open portions" or "the open tucked portions," it seems manifest that it is the tucked portions that establish the line.

Again, when we go to the next clause descriptive of the method, when the undertaking is to describe of what the method consists, right on the face of it, it is said that: "In forming tucks in suitable spaced wales along a transverse line of the fabric." And then that is succeeded by the expression, "and folding the fabric along the said line."

When, therefore, we come to the claims, and in one the reference is made to folding "along the said line" and in the other to folding "along the said transverse line," by reference back to what is set out in the specifications, the meaning of the claims, it seems to me, is inescapable.

According to the claims dealing with the folding feature, there also is a necessary connection in the language employed between the formation of the tucks and the folding. That is plain from an analysis of the words only. For example, in the first claim, it is said: "By forming tucks in suitably spaced wales along a transverse line of the fabric, and folding the fabric along the said line."

As I have said, the statement of the whole object of the patent is to create a scalloped or picoted edge. Now, when we turn to the claims, this is what it said: "The method of producing a picot edge"; the method of producing a picot edge by something, and the producing plainly is by the two things of forming tucks and folding in a certain way.

To read again the first claim: "The method of producing a picot edge in knitted fabrics by forming tucks in suitably spaced wales along a transverse line of the fabric, and folding the fabric along the said line."

Remember, further, that reading the whole—that is, the specifications as well as the claims together—the claims of the patent are limited to the edge which appears at the turn of the cuff and that they do not apply to what appears at the top of the stocking or at the top of the fabric before the turn-down into the shape of a cuff.

Having in mind that this is what the invention is asserted to be, and that this is what

is set out in the patent, we can inquire, and not until we have the conception of what is so embodied in the patent are we prepared to inquire, whether or not there was anticipation.

In support of the defense of anticipation in the prior art, five patents are cited. I have examined all of them. Frankly, I see nothing in anything that is set out in any of those patents—in the language employed; in the statements of invention; in the specifications; or in the claims—that manifests on the part of the patentee in what he himself says, or in the grant as evidenced by the letters patent that manifests on the part of the government, an intention to cover or comprehend anything whatsoever of the nature of what is involved in the patent in suit.

Look at the Wilson patent. What is it? That is for the manufacture of an entire stocking. It is for the arrangement of lacework, throughout the entire stocking from top to near the bottom, in stripes. It is for a seamless stocking, with lacework stripes. That is what it said in the document itself.

In a further description in the document, it is said: "This is produced by tuck needles, by knitting two courses and then tucking two courses." Elsewhere it is said: "By alternating the sections of plain knitting and lacework." There is nothing about tucks, nothing about ornamentation. No claim is made, there is no assertion of any kind, of any desire or intention to deal with the subject-matter of the tops of the finished product by the operation described or to accomplish ornamentation of those tops. On the other hand, in the patent in suit, the whole purpose is ornamentation, and the sole ornamentation covered by the process is in the very limited part of the edge of the cuff.

I see nothing in the language of the Wilson patent to indicate that the patentee had in mind, even if there had been any folding, that such folding would create anything except the inevitable edge, smooth or irregular, depending upon whether or not there was variation between the stripes, and, inasmuch as, on the face of the document itself, one stripe would be thinner than the other stripe, there would be unavoidable variation at the top, but that variation was not intended to be for ornamentation. It was merely that which could not be escaped, because it resulted necessarily, but resulted only, from the stocking being made in stripes, one of which was thin or open and one of which was thick.

The Costello patent and the Blood patent stand together. On their face, they are mere-

ly anti-run-back devices. Those are intended to be described, and they alone are described. Both of them are to prevent raveling. This is what it said in the Costello patent; to prevent raveling of web stockings, and this is accomplished by bands of displaced loop stitches. And that is all. Mr. Page said, as I understood him, that the device was used on flat knitting machines.

So of the Blood patent; that also is to prevent raveling. It says so; that is the whole burden of its song. It is brought out particularly that it is to add strength near the top of the garment so as to withstand the wear of the supporter clasp. That is the especial thing that is within the design or purpose of the Blood patent.

The Scott and Page patents deal with attachments or mechanisms. Both say so. The Scott patent is for a cam mechanism or arrangement of cams. There can be no extension of the meaning of this patent beyond its constituting merely a cam mechanism or an arrangement of cams. It does not in the slightest, it seems to me, approach what is covered by the patent in suit, which has to do with a process. The Regar patent has nothing to do with any mechanism except to apply mechanism that is familiar in the art. Inherently it is a process, and inherently, as it would seem to me, it is quite apart from a mechanism.

Moreover, as I read the Scott and Page patents, there is nothing in the language employed to indicate the slightest notion that there is or is to be involved any ornamentation or that there is any purpose of ornamentation. I may not have understood accurately or I may not remember accurately the statement of counsel for defendant in his opening, but it is my impression that the Scott patent was merely referred to to show the state of the art. I may be in error, but that is my memory of what was said; that it really was not cited for anticipation. However that may be, I have studied it with a view to seeing if it contains anything constituting anticipation, and I have discovered nothing.

The Page patent is for a tucking attachment for knitting machines. It consists entirely of a mechanism, and that mechanism is to move the cam to a tripping position, with means to trip the cam controlling devices. That, equally with the Scott patent, seems to be entirely outside of any issue with which we are concerned in this case.

Mr. Page drew attention to link 201, as I understood him. His statement was that the placing the link in the chain determines the position of the row of tuck stitches; for illustration, that putting a line of stitches in the welt was merely to mark where it should be turned. It is certainly capable of that; but there is nothing to indicate ornamentation or affecting the appearance of the garment, which is the sole thing with which we are concerned in this case.

I conclude, therefore, that there was no anticipation by the prior art patents cited.

Next, was there anticipation in the prior uses in manufacture?

Of the garments put in evidence, Exhibit F is the first for consideration. That is a full-fashioned stocking. As I understand, all agree that it has a picot edge. Upon that point the experts are in agreement. Mr. Page says and Mr. Regar says and Mr. Bley says that it is formed by transferring stitches. And what is of very great consequence, as I understood him, Mr. Page said that the device cannot be used commercially in a seamless machine. If that be so, then, inasmuch as we are here concerned with a method for employment in a seamless machine, there is no warrant for regarding Exhibit F as an anticipation of a method for employing what is familiar in the art in a seamless machine.

It would seem to me that improvements in seamless machines and improvements in full-fashioned machines, while the end in view may be the same in both, necessarily, and in the nature of things, proceed upon wholly different lines.

I, therefore, am unable to accept the force of the argument which was advanced, that the Regar process consists merely of substituting tuck stitches for transferred stitches. It would be a sacrifice of substance to form or words to make that a determining consideration, as I conceive it. We are dealing with realities. As I shall later indicate, as I have already to some extent indicated, we should not forget that part of my preliminary statement in which I tried to make clear that our concern in the case at bar is with a seamless machine, not with a flat machine, not with a full-fashioned machine. Unless we bear that in mind, the result, of necessity, would be to confine people to continuing to use one type of machine for a particular purpose; never to be able to employ a new method of getting a result similar to that which had been attained by the other machine, because there existed a patent covering a process which was applicable exclusively to the other. That would retard invention; not advance it.

An improvement, as I conceive it, which advances the uses to which a seamless machine may be put cannot be said to have been anticipated by a device employed in a full-fashioned machine to accomplish a purpose which theretofore could be accomplished only on a full-fashioned machine. The two stand apart upon the question of whether there be anticipation of one by what has been employed in the other, but which previously, through the use of a method, made possible the accomplishment by the one machine or something which theretofore could be accomplished only by the use of the other.

As I understand counsel, what is most relied on to establish prior art uses in manufacture is the collarettes, Exhibits K, L, M, and N. It is clear that these were for ornamentation. I understand also that it is without dispute that they are made with tucked stitches.

There are two sets of the collarettes. I will take up first the Otis collarette, Exhibit N.

I think we can dispose of that rather shortly. Indeed, I think it is disposed of by the testimony of Mr. Sutphen. I think it is proper for me to interpose by saying that Mr. Sutphen made a great impression on me. He is disinterested. He has been in this line of business for 51 years. I think he makes every effort to be accurate. He is the kind of man that, as matter of human nature, it is a pleasure to listen to. He is trying to tell the truth. He is trying to be fair. He has no guile within his make-up, as I can see it—his simple appearance, the look in his eye, the manifestations of his face. He is so engrossed with the thing which has constituted his entire life that he would not know how to answer except as his mind directs him in thinking. What does he say? He says that the Otis collarette is made with a special edge and is made on a special machine. If there were nothing else in his whole testimony as to Exhibit N—certainly, in the absence of explanation of what the special machine is—it would be incumbent upon the court to reject this collarette as an anticipation. At best, the proof relating to it is left in such vague shape that there is no possibility, as I conceive it, of reaching the conclusion that the device or the method, or whatever the special machine may be, could have in any way been an anticipation of the employment for ornamental purposes of a process to be used in a seamless machine.

In addition, as I understood him, Mr. Sutphen said, when he examined it under the glass, that the tuck of Exhibit N was different from that in any of these other types that were submitted to him. He said also that it was not what was sometimes referred to as the one and one method, which was involved in making some of the other collarettes.

That brings us then to the Roxford Knitting Mills' collarettes covered by Exhibits K, L, and M.

Mr. Vosburgh made clear that these are separately made and sewed on. One of the other witnesses said that the tops of the undershirts from which the collarettes in evidence were taken—and I suppose it would be equally applicable to collarettes of other types of garments—are cut out. That leaves a loose edge to the garment, and it is essential either that the loose edge be sewed down in some way or that some covering be put over it. The purpose of these collarettes is undoubtedly chiefly ornamental. Nevertheless, the object is also to get rid of the danger of raveling resulting from the looseness or open edges incident to cutting out the garment at the top.

As I said, Mr. Vosburgh makes it clear, and it is undisputed, that all the Roxford Knitting Mills' collarettes were separately created. They were just sewed on to the tops of the shirts. Is that anticipation of a process which is a part of the ordinary manufacture of a seamless garment, which will provide at the end, as part of the operation, an ornamental edge at the top of the cuff? I cannot see it.

But aside from what has been said, when we examine the proof as to all of these exhibits separately, there is nothing about them to indicate, as I understand it, the employment of any process whatever which is like or anticipatory of the process in the case at bar.

There is another fact. The Roxford Knitting Mills has been out of business since 1922. The proof as to the collarettes comes from a witness who produced these old garments that he bought in a store sometime ago. The admonitions given by the higher courts would require a trial court to be very reluctant to accept evidence gathered in that way as sufficient to nullify a grant of letters patent.

The last consideration mentioned, plus the proof given by Mr. Vosburgh as to how the Roxford collarettes were created, I believe entirely disposes of the Roxford collarettes without examination of the particulars of each of the three garments.

Let us, however, take up the garments.

Exhibit K is badly worn at the top. I think it is correct to say that all the witnesses who looked at it felt somewhat uncertain about it, because of the worn condition. Apparently, on the proof, the tuck is a familiar one that has been known for years; there is nothing new about it; it is of the identical character with the tuck that is involved in the circle marked on the cut stocking, Exhibit 5. It seems also, so far as the witnesses could gather, that it was made by two stitches on a needle.

When we come to Exhibit L, Mr. Regar says—I think he and Mr. Page are in accord about it—that this resulted from two tucks in each wale at the edge of the fold; or, as Mr. Page puts it, two lines of tuck stitches on the edge. There also the proof is that the tuck stitches are similar to those in the circle on the cut stocking, Exhibit 5.

When we come to Exhibit M, Mr. Sutphen says that there are two and possibly three courses of tucks. He said, however, that the tuck was formed entirely differently from the tuck of the patent in suit. That is undenied practically, and I think it is easily to be inferred from the other proof. He said further that the tuck is on every other needle, and it is produced by what is known as the one and one method—a tucking needle and then a plain needle and so on.

Mr. Page said as to Exhibit M that there are not less than one and possibly three tuck stitches on the edge. I don't think anybody says—certainly none of the experts—that there is a picot edge on Exhibit M in the true sense of a picot edge. The purpose of the picot edge being ornamentation, of necessity it involves symmetry.

The proof, so far as concerns all these collarettes, is too vague and indefinite, under the rules which limit a trial court in determining anticipation, to warrant holding them to be an anticipation of the patent in suit.

Last night I examined these collarettes under the glass. I should have very little confidence in such a personal examination of my own as a means of discovering the probative value of the exhibits. I can only say, as the result of my effort, that I was unable to see anything that added to their value beyond what was said by the witnesses or that they are anything else than some ornamental device created by some unknown means which was employed by a manufacturer of undershirts who sewed them on in places which had been left bare by cutting out the neck; who used them to prevent raveling of the edges and, incidentally, to present a pleasing appearance at the neck.

The next thing relied on by the defendant is Exhibits I and J, two of the open lacework stockings.

The only difference that I see between Exhibits I and J is that the black stocking, Exhibit J, is somewhat better made than the white stocking, Exhibit I. The testimony is somewhat fuller as to Exhibit I than it is as to Exhibit J. The two were discussed together by many of the witnesses; but stress in the proof was laid on Exhibit I, and I shall make reference to that.

Mr. Morris, Mr. Regar, and Mr. Sutphen substantially agreed in describing the method in the production of the stocking.

Mr. Morris said that it was made by two distinct groups of needles. He said that in one group one needle is out on each side of the tucking needle, and in the other group there is no needle out. Mr. Regar says that it is produced by tuck needles in various combinations or arrangements up and down the stocking, with some needles in and some out. That is substantially what Mr. Morris said, and I take it the intent is to express the same thing. It is all the way up and down; it is a process in the manufacture of the entire stocking. Mr. Sutphen says that the tuck needles are on each side of the open space where the needle is out. The needle is out on each side of the tuck stitch, and this allows the stitch on each tuck to float or be loose. He says one needle is left in and one is left outside. This results in the floating across the middle or held needle, where the yarn is held, and as many times as it wraps the needle there is a tuck.

This seems to be nothing but the ordinary course of manufacture; in producing open spaces as well as full or ordinary spaces in the manufacture of a stocking. There is inevitable irregularity as a result of having stripes of open and stripes of ordinary manufacture.

Now, what as to the top?

Mr. Page says that there is a wave line at the top of the welt, which is due to the tuck stitch; but he further says that the purpose of the turnover was to form the welt, and that there was no purpose of ornamentation — at least that is what I understood his testimony to be.

Mr. Regar said that the result at the top was a mere uneven effect, and that there was not formed any scalloped or picot edge.

Then Mr. Sutphen—upon whom I rely very much because of his wholly disinterested position and attitude in this case—says explicitly that the top is turned and sewed on with a sewing machine, and adds that it has no picot edge.

I feel that I ought to accept what Mr. Sutphen said. It is not really at variance with what the other witnesses said. Standing alone, it is enough to eliminate Exhibits I and J, as well as the entire group of collarettes, as constituting anticipation of the patent in suit.

There was a good deal of discussion of the spiral effect around the upper portion of the open lacework stockings. It is perfectly plain in Exhibit I. The dispute is only as to the cause.

Mr. Evans testified that the spiral feature was due to the yarn. He said further that it could be obliterated or reduced by matching the wales inside and out. He said also that the purpose of forming the welt was to thicken it so as to carry the garter.

Mr. Page said that the spiral effect was due to the operator who sewed the hem not removing it; that it came from the hard twisted yarn from which the fabric was made. He also said that the stocking is not folded along the same transverse line as the folding is done in the patent in suit; but that the spiral effect has nothing to do with the folding on a transverse line.

Mr. Regar said that the folding on a transverse line is impossible, because the fabric is spiraled at the top.

I cannot escape feeling that what Mr. Regar said, in the nature of things, is true. I was unable to see the force of the diagram produced by Mr. Page as furnishing any modification of what would be the ordinary understanding of what a transverse line is. I think Mr. Regar said that he would not regard it as wholly departing from the trade meaning of a transverse line if there were a slight variation from the right-angled position of the transverse line to the vertical line, and, after all, it seems to me that that is a rational employment of the words "transverse line."

As already stated, I examined these stockings under the glass. All that seems to me clear is that there is a mere irregularity in the edge, due to the way the body is made and unavoidable when in the body there is a combination of a plain portion with an open or lace portion.

As I have also previously stated, Exhibit J stands together with Exhibit I. In it, as well as in Exhibit I, the variation around the top, as I see it, is attributable merely to the variation between thick portions and thin portions.

I have examined all the other exhibits; but they were not commented on by counsel and I see no occasion to comment on them myself, except to say that I discover in them no anticipation.

There is no proof of anticipation by publications.

The result of all that I have said is that, upon the issue of anticipation, the proof would not warrant the court in finding that there was anticipation.

There are certain general facts also which are confirmatory of the conclusion I have reached about anticipation.

At the very best, the prior uses, as disclosed by the proof, are very vague.

As I understood him, Mr. Page expressed the opinion that the 1912 machine, as well as the Scott machine, was capable of producing a scalloped edge. Yet Mr. Page also said very frankly that none was produced prior to 1928 or 1929 by either machine, and the proof is without dispute that the demand for the picot edge arose as early as 1924—perhaps one witness said as early as 1925—but the preponderance of the proof is that it went back to 1924. There is the absence between 1924 and the later date (1928 or 1929) of the production by the 1912 machine or by the Scott machine of a picot edge, if it were capable of producing it. That fact is of quite considerable significance in determining whether or not there was anticipation.

Mr. Sutphen said that, up to the time that he left the employment of the defendant in 1928, so far as he had discovered, there was no machine for forming a picot edge on knitted fabrics. Now, a man with his inquiring mind and his interest in the art in which his life had been spent would have been very apt to know about a machine for that new and useful purpose, if it had been in existence. I think, therefore, that fact also is confirmatory of the conclusion that I have reached that it had not come into existence in 1928.

Then there is another very important general fact. Ornamentation as a purpose—and I should say particularly ornamentation of a garment for the use of the ladies—would have symmetry as a primary feature. Any kind of ornamentation—ornamentation even of collarettes on undershirts for men—would

aim to render the garments more salable, and accordingly would also have symmetry in view.

From my examination of the defendant's exhibits, I am unable to discover anything about the tops that goes further—or, I would put it at least to this extent, that certainly goes further—than to result from some purpose other than ornamentation as a process. There is nothing about the tops appearing to come from a device to create ornamentation. In most instances the edge seems to be merely an irregularity at the top as a consequence of the method employed in producing the entire stocking, in the case of stockings. This is quite indicative that symmetry was never aimed at, and symmetry is the whole aim of the patent in suit. Symmetry is the whole aim of the picot edge. This feature of the exhibits is a consideration, it seems to me, which is additionally confirmatory of the conclusion I have previously stated.

 There is another general consideration which is persuasive. This is that, under the rule as laid down by the Supreme Court, I am compelled to resolve doubts in favor of the patent. On any of the evidence—either the physical exhibits or the testimony of the witnesses—all it seems to me that a rational mind could find it possible to say is that there is some doubt on the subject. That is not enough to upset a patent.

I conclude, therefore, both on the examination of the evidence and in view of the confirmatory considerations recited, that there was no anticipation of the patent in suit.

That brings us to the inquiry as to whether or not there was invention.

I assume that anybody would concede that the process of the patent in suit is useful and valuable in manufacture. It must be borne in mind that it is employed in a seamless machine. I do not think that it can be said to be a mere substitution of tuck stitches for transferred stitches. As I have indicated before, I think that would involve us in overlooking realities and adopting mere forms of words.

What has caused me most trouble—and this is what causes trouble in many cases—is making application of the rule, laid down in the Ansonia Brass Company Case in 144 U. S. 11, 12 S. Ct. 601, 36 L. Ed. 327, as to what is analogous. There is undoubtedly here a new use in the branch of seamless manufacture of a process that will produce ornamentation at the turned top of the garment. Is that analogous, in the sense of the decisions, to the production of a picot edge on a flat machine for full-fashioned garments, such as is illustrated in Exhibit F?

 What "analogous" means is very hard with precision to determine. But when we give due regard to the realities, and when we have due regard for the consideration that the Regar process is one to be employed in seamless manufacture, then it seems plain to me that it cannot be maintained that this application in the branch of seamless manufacture is analogous to what was employed in the flat machine that produces full-fashioned stockings. There again, if there be doubt, I must lean to the patent.

I confess that, until near the end of the testimony of Mr. Regar, I was experiencing great difficulty in comprehending of what his invention consisted; whether the use of the combination of tucks and folding as described in the patent or the outcome which he claimed in his description was an invention; whether it was an invention that left the edge ornamented in a scalloped or picoted way at the turn of the cuff; or whether it was something else. I did not get his idea clear until he explained the mechanical result, the necessary incident of the process of tucking when the turnover came. It was not until he made this explanation that I comprehended how, by this means, there could be produced, as there must be produced, the ornamental effect as he designed.

 I think that, in the sense of the law, the devising of his new method to bring about this result, which is both useful and valuable, which for the first time, so far as the proof shows, was rendered applicable to the seamless branch of manufacture and hence must be deemed to be a new use, therefore involved invention.

Was there infringement?

Upon that issue, as I understand the witnesses, there really is no dispute. The experts seem to agree, and examination discloses, that Exhibit 2 so nearly approached the patent in suit that I cannot escape the conclusion that it is an infringement.

The result is there will be a decree for the plaintiff. I hold the patent valid and infringed. I sustain both claims. There should be an injunction, as well as an accounting, with costs.

A decree may be taken accordingly. Settle it on ten days' notice.